Maria **PEREZ et al., Individually and on behalf of all others similarly situated, Plaintiffs,**

v.

Abe **LAVINE, as Commissioner of the New York State Department of Social Services, and James R. Dumpson, as Commissioner of the New York City Department of Social Services, Defendants.**

No. 73 Civ. 4577 (CHT).

United States District Court,
S. D. New York.

March 29, 1976.

1342

Louis J. Lefkowitz, Atty. Gen. of N. Y., New York City, for defendant Abe Lavine; Thomas R. McLoughlin, Asst. Atty. Gen., of counsel.

W. Bernard Richland, Corp. Counsel, New York City, for defendant James R. Dumpson; Greg Frost and Gayle Redford, Asst. Corp. Counsel, New York City, of counsel.

Kaiman Finkel, The Legal Aid Society, Civ. Div., John E. Kirklin, Director of Liti-

gation, The Legal Aid Society, Civ. Appeals Bureau, New York City (Eric A. Rundbaken and John W. Corwin, New York City, of counsel); Steven J. Cole, Adele Blong, Center on Social Welfare Policy and Law, Marttie L. Thompson, Community Action for Legal Services, Inc., New York City (Michael A. O'Connor, New York City, of counsel); Donald Grajales, Rina Morales, Bronx Legal Services, Corporation "B", Boston, N. Y. (James Potter, Michael Fahey, New York City, of counsel), for plaintiffs.

## OPINION

TENNEY, District Judge.

Plaintiffs brought this action to trial before the Court without a jury. The case presents yet another challenge to the beleaguered New York City administration of welfare programs. Jurisdiction was predicated upon 28 U.S.C. §§ 1343(3) and (4).[1] A class was certified at that time under Fed. R.Civ.P. 23(b)(2) to include all applicants and recipients of public assistance at Bronx welfare centers. Subsequently, this Court enlarged the plaintiff class which now encompasses all recipients of and applicants for public assistance who live in New York City and are within the geographical jurisdiction of the forty-four Income Maintenance welfare centers in New York City.[2] Operating under the authority of the New York State Department of Social Services, these public assistance programs are administered locally by the New York City Department of Social Services.[3] Defendants named in the complaint include the Commissioner of the New York State Depart-

ment of Social Services, the Commissioner of the New York City Department of Social Services, and the Administrator of the Human Resources Administration.

Plaintiffs contend that the policies and practices of the New York Department of Social Services ("DSS") and the Human Resources Administration ("HRA") both delay and deprive members of the class (both applicants and recipients) of the benefits of various public assistance programs as provided for in federal statutes and their implementing regulations. In pertinent part, these laws and regulations are as follows:

*Aid to Families with Dependent Children (AFDC):*

"42 U.S.C. § 602(a) A State plan for aid and services to needy families with children must

. . . . .

(10) provide, effective July 1, 1951, that all individuals wishing to make application for aid to families with dependent children shall have the opportunity to do so, and that aid to families with dependent children shall . . . be furnished with reasonable promptness to all eligible individuals."

"45 C.F.R. § 206.10 *Application, determination of eligibility and furnishing of assistance.*

(a) *State plan requirements.* A State plan . . . shall provide that:

(1) Each individual wishing to do so shall have the opportunity to apply for assistance under the plan without delay.

. . . . .

---

1. Decision of *J.* Bauman, reported in 378 F.Supp. 1390 (S.D.N.Y.1974). Under the authority of *Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *Almenares v. Wyman,* 453 F.2d 1075 (2d Cir. 1971), *cert. denied,* 405 U.S. 944, 92 S.Ct. 962, 30 L.Ed.2d 215 (1972), the Court possessed jurisdiction to hear the substantial constitutional claim raised in the complaint as well as the pendent statutory claim, *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

2. Decision of this Court, dated Dec. 13, 1974. Consisting of approximately 298,000 cases, or more than 1.4 million recipients and applicants

for assistance under the federal programs of Aid to Families with Dependent Children (AFDC), Aid to the Aged, Blind and Disabled (AABD), Food Stamps, and Medicaid, and/or the non-federal Home Relief (HR) program, plaintiffs request declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202 and Rules 54, 57 and 65 of the Fed.R.Civ.P.

3. Titles IV, XVI and XIX of the Social Security Act, 42 U.S.C. §§ 602, 1382, 1396 *et seq.*; the Food Stamp Act of 1964, 7 U.S.C. §§ 2011 *et seq.*; New York State Social Services Law § 157, 18 N.Y.C.R.R. §§ 350 *et seq.* and §§ 435 *et seq.*

(3) A decision shall be made promptly on applications, pursuant to reasonable State-established time standards . . . ."

"45 C.F.R. § 233.120 *Emergency assistance to needy families with children.*

(a) *Requirements for State plans.* A State plan . . . providing for emergency assistance to needy families with children must:

.    .    .    .    .

(5) Provide that emergency assistance will be given forthwith." [4]

### I. *Composition of Plaintiff Class—"Applicants" Defined*

At trial, plaintiffs' counsel asserted that the class of persons represented comprised "persons who are seeking to apply for assistance or persons who, while on the rolls, are seeking to apply for additional benefits." (Transcript at 418). Characterization of this latter group of persons as either "applicants" or "recipients" is important because it determines the time allowed for agency acceptance of the requests for additional aid. If the individual who is already enrolled in a welfare program and seeks an increment or *change* in benefits is deemed to be an "applicant", his request for assistance must be heard "without delay" under the standard imposed by 45 C.F.R. § 206.-10(a)(1). On the contrary, if he is a "recipient", his request is treated as an "undercare" request which must be considered with "reasonable promptness" under 42 U.S.C. § 602(a)(10) and 45 C.F.R. § 206.-10(a)(3). Basically, the issue is whether an individual's entitlement to an *initial* determination of eligibility is more pressing than

his right to have his needs and benefits reassessed when his circumstances change.

Defendants' position is that once someone is enrolled on welfare, he becomes a recipient and retains that status for all further action in his case. He has completed the formal application process, has submitted the necessary documents and forms for verification, and has been found eligible for public assistance. With all the preliminary work in his case concluded, this individual is in a considerably different posture from the person who enters the Income Maintenance center for the first time to ask for public assistance. Greater attention is needed to review the latter person's request which must be accompanied by a multitude of papers. And because he is receiving no public aid at that time, he is in a more urgent situation than someone already receiving some assistance.

It seems clear, then, that the initial determination of eligibility involves a distinct and more compelling interest than a request for modification in aid. By consolidating as "applicants" both persons who are "seeking to apply either initially or for additional benefits," [5] plaintiffs attempt to supplant a "reasonably prompt" standard of consideration with a measure of "without delay." At trial, plaintiffs used the illustration of an AFDC recipient who becomes pregnant and seeks additional benefits to accommodate the new child. The woman's right to increased benefits is undisputed, but should her claim get the same urgent attention as that of someone not receiving any aid who applies in the first instance?

The definitional sections of the federal regulations do not directly address the issue

---

**4.** Additional statutes involved include:

*Medicaid Provisions*

42 U.S.C. § 1396a. *State plans for medical assistance—Contents*

(a) A State plan for medical assistance must—

.    .    .    .    .

(8) provide that all individuals wishing to make application for medical assistance under the plan shall have the opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals.

*Food Stamps*

7 U.S.C. § 2013

(a) The Secretary is authorized to formulate and administer a food stamp program under which, at the request of the State agency, eligible households within the State shall be provided with an opportunity to obtain a nutritionally adequate diet through the issuance to them of a coupon allotment . . . .

**5.** Transcript at 422.

of categorizing the request for additional aid, but they do provide some elucidation. Title 45, Part 206 of the Code of Federal Regulations is entitled "Application, Determination of Eligibility and Furnishing of Assistance—Public Assistance Programs" and seems to refer to newly submitted requests by persons not enrolled on welfare. Subsection (b) provides the following:

"*Definitions.* For purposes of this section:

(1) 'Applicant' is a person who has, directly, or through his authorized representative . . . made application for public assistance from the agency administering the program, and whose application has not been terminated.

(2) 'Application' is the action by which an individual indicates in writing to the agency administering public assistance his desire to receive assistance . . . . An application is distinguished from an inquiry, which is simply a request for information about eligibility requirements for public assistance.

Such inquiry may be followed by an application."

In setting forth the procedure for submission and acceptance of applications, subsection (a) states:

"*State plan requirements.* . . .

(1) Each individual wishing to do so shall have the opportunity to apply for assistance under the plan without delay. Under this requirement:

**6.** 45 C.F.R. § 206.10 further provides:

(a)(2)(ii) Procedures shall be adopted which are designed to assure that recipients make timely and accurate reports of any change in circumstances which may affect their eligibility or the amount of assistance.

. . . . .

(9) Where an individual has been determined to be eligible, eligibility will be reconsidered or redetermined:
(i) When required on the basis of information the agency has obtained previously about anticipated changes in the individual's situation;
(ii) Promptly, after a report is obtained which indicates changes in the individual's circumstances that may affect the amount of assistance to which he is entitled or may make him ineligible . . . . .

(i) Each individual may apply under whichever of the State plans he chooses;

(ii) The agency shall require a written application signed under penalty of perjury, on a form prescribed by the State agency . . . . ."

Furthermore, language in certain sections indicates that the regulations in fact do contemplate a distinction in status between the initial applicant and the recipient who is already certified as eligible.[6] An "applicant" is one who must submit an official eleven-page application form. An individual is afforded the opportunity to become an applicant when he obtains this form and thus is able to initiate the procedure for ascertainment of eligibility. After his application interview, at which time the form is regularly filed, an applicant has done all he can to apply for public assistance. Once eligibility is found, he is entitled to benefits consonant with his needs. As his needs change, he may request a change in benefits without submitting all the same forms again. Acquisition of the application form, then, is the first step in the application *process.*

Because the interest of and procedures for a *new* applicant may be distinguished from those concerning a recipient seeking additional aid, and because the regulations appear to acknowledge this status distinction, the Court concludes that it is new applicants whose requests were intended to be governed by the standard of "without delay" in 45 C.F.R. § 206.10(a)(1).[7]

**7.** In addition, the regulations provide for immediate attention in the event of an "emergency" situation. 45 C.F.R. § 206.10(a)(5) directs that there must be arrangements to assist applicants and recipients in obtaining medical care and services in emergency situations on a 24-hour basis, 7 days a week.
Notably, the regulatory scheme expressly authorizes provision of emergency assistance to both classifications, "applicants" and "recipients". *See* Transcript at 479–80. 45 C.F.R. § 233.120(a)(5) directs that "[A State plan must] provide that emergency assistance will be given forthwith." Mr. Burdick explained the operation of the emergency program as follows:
"For a person who applies for assistance we have relegated times and in our scheduling apparatus we provide for same day appointments for those persons who have had a

## II.  *Categories of Assistance in Issue*

The Court has entertained motions to dismiss the claims regarding medicaid and food stamp benefits, and for the reasons set forth below, grants these motions.  The statutes governing medical assistance (42 U.S.C. § 1396) and food stamp distribution (7 U.S.C. § 2011) refer to "the opportunity to obtain  .  .  .  ." This language is substantially similar to that employed in the statute governing AFDC benefits (42 U.S.C. § 602).  Apparently relying on this similarity, and on 45 C.F.R. § 206.10(a)(1)(iv) which directs that an individual found eligible for financial assistance becomes automatically eligible for medical assistance "without a separate application," plaintiffs submitted no independent evidence in support of those claims at trial.

■■■ It is clear, however, that one may directly apply for medical aid without first applying for a category of public assistance.  Like the AFDC program, medicaid operates with grants authorized by the United States Department of Health, Education and Welfare, and is administered locally by the Office of Community Services.  Although persons eligible for AFDC are automatically eligible for medicaid, persons who do not qualify for welfare assistance may nevertheless still qualify for medicaid.  *See* 45 C.F.R. § 206.10(a)(1)(iv)(c).  The food stamp program, on the other hand, operates under the aegis of the Department of Agriculture.  *See* 7 U.S.C. §§ 2011 *et seq.*  Food stamps are not considered "welfare" benefits, and may be obtained without applying for welfare.

■■■ There are separate and less restrictive qualifications for food stamps than for financial assistance.  In addition, applications for medical services and food stamps need not be submitted at an Income Maintenance center, where the applications for direct financial assistance programs are returnable.  The interested individual is thus able to bypass the center entirely in applying for either of these two categories of federal aid.

■■■ Therefore, because the application procedure varies for the different categories of aid, and no independent evidence was introduced to support the claims of violations of these programs, the Court dismisses those portions of the complaint alleging violations of federal food stamps and medical assistance programs.

## III.  *Alleged Violations of the Statutory Scheme*

The alleged violations of the federal public assistance scheme may be summarized as follows:

(1) Plaintiffs contend that the DSS practice of requiring an informal "pre-screening" of interested individuals by personnel at the Income Maintenance center (specifically, the "*A* Receptionist") for an initial assessment of "presumptive eligibility" constitutes a denial of the statutory opportunity to apply for public assistance.  Under the current procedure, the "*A* Receptionist" is instructed to distribute application forms and concomitant instructions only to those persons who appear to be eligible on the basis of the informal oral interview.  Those who do not appear to be eligible must specifically request an application for public assistance before the same will be provided.  Plaintiffs claim that persons in fact eligible for public assistance who do not reveal "presumptive eligibility" are *denied* applications and therefore are deprived of the opportunity to apply for aid.

(2) Plaintiffs contend that the long lines regularly forming outside the Income Maintenance centers, often in pre-dawn hours, deter numerous eligible individuals from applying for assistance and thereby deprive them of the opportunity guaranteed by statute.  The long lines, the physical hardships that must be endured, and the onerous

---

fire of some kind or other disaster or who have been discharged from institutions and are homeless.

"For those persons who are threatened with a utility shutoff or have a utility turnoff.

For those persons who are threatened with eviction.  These are situations in which we have said that they will be seen before others who come to the offices."  (Transcript at 480).

arrangements necessary to accommodate visits to the centers, when compounded with the frequency of necessary return visits, allegedly contribute to a situation where "some members of the plaintiff class are not merely postponed from being able to apply for or receive aid, but in the end, simply do not go to the centers because they cannot or will not endure the conditions they know to exist there." (Plaintiffs' Post-Trial Memo. at 75).

(3) The plaintiffs further contend that thousands of eligible individuals are delayed and/or denied the opportunity to apply for aid when they are subjected to the "turnaway" practice of the agency at overcrowded centers. On a given day when the work quotas of center personnel are filled, the remaining individuals are sent home without conferring with anyone. This phenomenon is termed "closing" and can occur at two different stages in the application process. The first is commonly referred to as "application group closing" and describes persons turned away from initial pre-screening with an "A Receptionist". The second is the "interview group closing" where an individual appears for his scheduled appointment but is turned away without having his formal interview because the interviewer's schedule is filled before he can take all the appointments made for that day.

(4) Plaintiffs also allege that there is an unlawful delay in the DSS practice of accepting applications for filing *only* at the time of the formal application interview. Since an application is considered complete at the point it is filed, plaintiffs argue that any delay in obtaining the application and in submitting it for filing amounts to a delay in the opportunity to apply, in contravention of the directive of 45 C.F.R. § 206.-10(a)(1)(ii).

Two additional claims raised by plaintiffs at trial and in their post-trial memoranda are as follows:

(5) That the defendants, aware of the existing illegal situation, took no steps to correct it; and

(6) That the total effect of the above-mentioned delays and denials is in violation of the due process protections of the Fourteenth Amendment.

The Court shall address each of these claims seriatim:

A. *Pre-screening for Presumptive Eligibility*

Plaintiffs contend that the delays inherent in the DSS procedures and policies deny individuals the opportunity to apply for assistance. The agency practices were testified to in detail by various applicants and by DSS and HRA personnel. The procedure is best described in the pamphlet circulated among the Income Maintenance center personnel, entitled "Revised Application Process", the pertinent parts of which are reprinted in the note below.[8]

**8.** DETAILED INSTRUCTIONS
I. FUNCTION OF THE "A" RECEPTIONIST IN THE APPLICATION PROCESS

The Income Maintenance Specialist who serves as Application Receptionist is known as the "A" Receptionist and does the initial screening of persons who are applying for public assistance. He is responsible for the first impression which the applicant has of the Center and it is important that he be helpful and courteous in receiving the client and in helping him to understand what the eligibility requirements and the application process entail.

The "A" Receptionist interprets eligibility requirements for public assistance and the need for documentation, on an individual basis, to those persons who inquire about or wish to apply for public assistance.

He issues Application Forms to individuals who appear presumptively eligible, answers questions raised by the applicant, interprets the various parts of the Application Form, explains the necessity for its proper completion, indicates the types of documentation required at the appointment interview and schedules an appointment for an interview at which he has an opportunity to present his completed Application Form and discuss his situation.

The "A" Receptionist maintains a daily appointment register on which he schedules the appointment interview for the applicant with an Income Maintenance Specialist known as the "A" Interviewer. The "A" Receptionist distributes appointments in relation to time and available staff in accordance with instructions received from the Assistant Office Manager. (Revised Application Process at 6–7).

[The procedure is further explained as follows:]
RETURN OF THE APPLICATION

In sum, the pre-screener performs five basic functions:

(1) Assuring that the interested individual is at the proper center (both geographically and according to category of aid);

(2) Determining whether the individual is applying or reapplying for aid or a related service;

(3) Determining whether the individual appears to require "emergency" assistance;

(4) Ascertaining "presumptive eligibility"; and

(5) Giving individual explanations of the eligibility requirements and application process where necessary.

Those found presumptively eligible for public assistance are automatically provided with an application form, an accompanying information kit,[9] and an appointment for an application interview in the near future.

Those not found presumptively eligible are informed that they do "not appear to be eligible for public assistance." (Transcript at 583). Such persons are then issued the application form only if they specifically request it.[10] Plaintiffs contend that the lack of instructions covering the situation where the individual does not qualify as "presumptively eligible "signifies a department policy of withholding applications from such persons thereby denying them the opportunity guaranteed under 42 U.S.C. § 602 to apply for public assistance. Martin Burdick, Director of Income Maintenance Programs, explained that the Revised Application Process was not an official policy statement, but

"that this is an instructional [sic] to staff . . . ., that it is a methodology for a staff member to learn his job, that it is written in such a way so that there is a sequence or a logical order by which the A receptionist goes through a series of steps, and if you follow it through, you will see that it does end with that kind of a decision which points towards the fixing of an appointment after making a

Upon the return of the applicant for his scheduled appointment, the "A" Receptionist will determine whether the application form has been completed and signed. If important questions remain unanswered the "A" Receptionist explains to the applicant the need for a completed application form, and determines the reason for the failure to give necessary information. Staff in the Center shall be used to help the applicant complete his application, if he requires the help, prior to the interview with the "A" Interviewer. In some instances another appointment with an "A" Interviewer may be scheduled but this must be as early as possible. Caution must be used in any rescheduling to avoid unnecessary delay and hardship to applicants.

The applicant who appears presumptively eligible for assistance, but states that he has encountered a problem in securing the basic documents relating to his eligibility, may be referred for his scheduled Application Interview but assistance may not be granted until the documents are presented. The "A" Interviewer may be helpful during the interview in suggesting alternate means of securing the required documents. (*Id.* at 3).

**9.** INITIAL VISIT OF APPLICANT TO CENTER

The "A" Receptionist will provide the applicant with an Application Form (DSS–1994), an appointment slip, a list of the documents which are required to substantiate eligibility Form M–49 (Civil Rights Act of 1964 and the Right to a Fair Hearing), and the following State pamphlets: "How New York State Helps When Illness Strikes", "Helping People to Help Themselves", and "Food Stamps". The "A" Receptionist will explain the application process and will make clear the importance of the required documents. (*Id.*)

10. Mr. Burdick explained the typical situation which would lead the pre-screening receptionist to conclude that an individual was not presumptively eligible for assistance:

"There is an interview process during which the prescreening receptionist is trying to ascertain if the person has made himself eligible by trying to obtain the kinds of resources that are available to him other than public assistance, for example, filing unemployment insurance benefits, having filed for supplemental security income or what his current income is.

"Now, if the interview exchange would show that the individual has not yet applied for unemployment insurance benefits or not yet applied for supplemental security income, he would be requested to do so first.

"If the individual has income that exceeds what his family needs are, he would be told that he does not appear to be eligible for public assistance." (Transcript at 583).

number of inquiries and giving out a number of documents.

'That does not necessarily mean that if an individual is not presumptively eligible but asks for an application blank and kit and the documents that this procedure intended to not give him the application form." (Transcript at 580).

If the Revised Application Process is meant to apprise personnel of what they may expect to encounter, then it fails because there are no instructions for proceeding when presumptive eligibility is not found. Plaintiffs infer that the real purpose of pre-screening is to discourage and deter people from applying for assistance. Consequently, plaintiffs contend that the presumptive ineligible who leaves the center empty-handed because he does not make the necessary request is thus denied the opportunity to apply for welfare.

Despite the myopic administrative instructions of the Revised Application Process, the Court cannot conclude that the failure of the DSS to automatically issue applications to everyone entering an Income Maintenance center violates the statutory scheme. There is no *denial* of the opportunity to apply for aid because the presumptively ineligible person will nevertheless be provided with a form upon request. The procedure does not "preclude the opportunity for an individual to apply and obtain a determination of eligibility or ineligibility" as prohibited by 45 C.F.R. § 233.10(a)(1)(vi), although it may be far from responsive to the public need. In addition to prohibiting "preclusion", the regulations seem to recognize that not every expression of interest portends an application for welfare. 45 C.F.R. § 206.10(b)(ii)

enunciates a distinction between an "application" and an "inquiry".

For these reasons, the Court cannot find that the statute and regulations mandate that an application form be handed automatically to everyone entering a center, nor can it find a violation of anything other than good business judgment in the agency practice of issuing forms only upon specific request or utterance of the "magic words" . . . "I wish to apply." (Transcript at 586). This phrase is far from "abracadabra" and its logic is attenuated, but the practice does not preclude or deprive anyone of the opportunity to apply for assistance.[11]

Because it is reasonable to expect that someone desiring public assistance would specifically ask for an application if he is not automatically given one, the Court must conclude that the pre-screening determination of "presumptive eligibility" does not truncate the opportunity to apply for assistance, even if its value is doubtful. Indolence and inefficiency in the administration of social services would be best remedied by legislation aimed at overhauling the present operation of the system. Within the existing structure, however, some streamlining is possible to make welfare more responsive to the financial exigencies of both the city government and the eligible individuals.

There was some testimony at trial regarding utilization of other organizations and community agencies to perform the functions ordinarily done by the pre-screener at the Income Maintenance center. Mr. Burdick explained that "where agencies have indicated a desire to do that which [the Court] suggested, we have provided applications." (Transcript at 484).

---

**11.** It remains unclear at what point in time the individual must make this request. It is likely to be a second request since a potential applicant presumably indicates his interest when he first enters an Income Maintenance center. Nevertheless, the distinction between an "application" and an "inquiry", acknowledged in the regulations, indicates that the draftsmen intended something more than a general expression of interest to constitute a request for issuance of an application. *See* 45 C.F.R. § 206.10(b)(2). In addition, it is likely that the agency procedures are communicated in the general talk and exchange of information among the "streetwise" individuals waiting outside the centers. It is commonly recognized that dealing with a bureaucracy is facilitated by a tenacious attitude. It would simply be patronizing to assume that interested persons with empty stomachs are less aware of such realities than other people. In fact, it is almost impossible to avoid the news reports which so frequently discuss the functioning of the welfare system.

Although some effort may have been made, it seems to have been, at best, a tepid one. The Court is not convinced that defendants have thoroughly exploited the possibilities of outside participation in the distribution of services. Clearly the DSS should not rely on the initiative and diligence of the Legal Aid Society and Legal Services offices to cure its own deficiencies. Just as these legal organizations play an integral part in disseminating information about the rights of individuals in social service programs, other sources of community activity and communications can participate in a similar fashion.

Hospitals and churches, for example, are organizations which are open to the public and able to accommodate the irregular schedules of many potential welfare applicants whose daytime hours are often spent seeking employment. Moreover, alternate locations for the distribution of forms and information would save numerous people the expense and effort entailed in travelling to a designated Income Maintenance center, waiting on line, arranging for childcare during that time, etc. This alternate procedure should result in shorter lines, and, hence, lessen delays at the centers.

It is important to note that the DSS has authorized local organizations to dispense applications, thereby delegating the pre-screening duties ordinarily performed by the "*A Receptionist*" at the Income Maintenance center.

This fact illustrates a salient point. In addition to the ultimate function of distributing applications, the outside agency serving as an alternate or "surrogate" receptionist can: (a) direct a potential applicant to the correct center for an interview appointment and for filing his application; (b) he can determine whether someone is applying for aid or reapplying for a related service, in which case a form might not be necessary and the individual referred directly to the appropriate center for an appointment; (c) he can ascertain "emergency" circumstances and send emergency cases directly to the appropriate center; and (d) finally, he can explain the application form and accompanying information kit. Notably, the ad hoc determination of presumptive eligibility is the one duty regularly performed by the "*A Receptionist*" that is incapable of performance by an outside agency. If the ultimate function of the pre-screening process is the issuance of applications, to which assessment of presumptive eligibility is merely incidental, then the agency delegation of the pre-screening procedure seemingly signifies tacit approval to disregard that non-delegable informal determination. The DSS policy of making ad hoc oral assessments of presumptive eligibility indicates its poor planning and allocation of resources, but because it neither denies nor delays the ultimate dispensation of applications, there is no statutory violation which the Court can order to cease.

### B. *Long Lines—The Deterrence Effect*

Plaintiffs contend that the long lines regularly forming at the Income Maintenance centers deter numerous eligible individuals from applying for assistance, and that the deterrence amounts to a denial of the opportunity to apply. Evidence on this point consisted primarily of the expert testimony of a university professor of economics. Employing the basic economic model of supply and demand, the witness concluded that long lines demanding a service denote a shortage of supply of that service. He analogized to the recent gasoline shortage observing that "[lines] fluctuate in response to changes in supply." (Transcript at 372). Without engaging in a long discourse on the gasoline shortage, the Court takes note that much of the congestion at gas stations was caused by consumer panic in a situation clearly distinguishable from the instant case.

The congestion here may be more easily understood as the reaction and response of people who arrive early in order to avoid administrative delays. There is no basis to conclude that people believe there may be a shortage of the government service rather than an indication that they wish to obtain the service as soon as possible. Qualification for benefits will depend on eligibility

requirements and not on an arbitrary number of people able to be seen by personnel on a given day. For this reason, the Court finds that applicants arrive early to pick up applications and complete them so that they can avoid, as much as possible, the bureaucratic delay indigenous to paper-processing activities.

45 C.F.R. § 205.70 mandates that policy statements and manuals affecting agency procedures be made accessible to public reference in diverse locations and available for individuals upon specific request. 45 C.F.R. § 205.10(a)(3) directs that

"(3) Every applicant or recipient shall be informed in writing at the time of application . . .

(i) Of his right to a hearing, as provided in paragraph (a)(5) of this section;

. . .

. . . . .

(5) An opportunity for a hearing shall be granted to any applicant who requests a hearing because his claim for financial or medical assistance is denied, or is not acted upon with reasonable promptness . . . ."

Evidence of a telephone survey conducted by a member of the staff of the Legal Aid Appeals Bureau during hours of peak traffic at the Income Maintenance centers was also submitted to the Court. Generally, the midday caller was advised that the center was too crowded on that day and that a potential applicant would have the best chance of being seen on the same day if he arrived early in the morning. This does not indicate a short supply of aid, but of administrative resource and capacity, that demand surpasses available personnel work time on a given day. In rebuttal, defendants introduced evidence to show that pre-

dawn congestion regularly dissipated after the center opened for business.

A minimum of compassion and the slightest penchant for efficiency would lead one to deplore the onerous conditions existing at many of the welfare centers, but this alone is insufficient for the Court to conclude that the congestion itself is such a deterrence to interested individuals as to amount to a denial of their opportunity to apply for public assistance under 42 U.S.C. § 602.[12]

C. *"Closings" and "Turnaway" of Applicants—Denial of the Opportunity to Apply*

As previously mentioned, plaintiffs challenge a practice commonly referred to as "closing" whereby persons are sent home from a center because the staff members are too busy to assist them. Plaintiffs complain of two types of "group closings." The first occurs when, due to overcrowding, individuals are unable to see the pre-screening "A Receptionist" and thus cannot obtain an application form and interview appointment. A second type of closing occurs when persons scheduled to appear for interviews are told upon their appearance that interviewers are already "booked" for the day and unable to grant further interviews on that date. Those people are then rescheduled to return at a future time for their interviews. Defendants contend, however, that even when under-care groups close, the "A Receptionist" will continue to dispense application forms to those persons who request them. (Testimony of Mr. Burdick, Transcript at 568). The Court would agree that, as long as application forms are available to all who request them, there is no denial of the opportunity to apply without delay.

12. Although not raised on the record, an argument may possibly be made that the individual who lacks the physical capability to wait at a welfare center should receive "emergency" treatment. 45 C.F.R. § 206(a)(5) instructs agencies to promptly furnish aid to applicants in emergency straits. The Department policy is that an "A Receptionist" assesses the level of emergency of potential applicants and provides for expedited attention when needed. *See* note 7, *supra*, and Transcript at 479–80, distinguishing between the emergency situations of applicants and under-care recipients. It is possible that the regulation which requires that "there must be arrangements to assist applicants and recipients . . . in emergency situations" is violated when an emergency client is unable to assert his emergency needs. .

The problem exists, however, in the grim reality that before obtaining their applications, most would-be applicants must first see the pre-screening receptionist, which is not always possible on the initial visit to an overcrowded Income Maintenance center. Mr. Burdick admitted at trial that "from time to time an application pre-screening receptionist was not taking everybody that was coming to the Center on the day that they came to apply." (Transcript at 595).

Plaintiffs suggest that there are quotas imposed on the number of application forms distributed per day, a procedure designed to discourage and deny would-be applicants an opportunity to make their applications. (Plaintiffs' Post-Trial Brief at 38). Although the record is replete with examples of administrative inefficiency, the Court cannot conclude that defendants' motives were malevolent. Burdick testified to steps taken by the agencies including an increase in the number of pre-screening receptionists available to see initial entrants to the centers, extended office hours and greater scrutiny of internal operations. (Transcript at 477, 492, 550–59, 571, 594, 603–18, 690–91).

The second type of closing is the interview group closing. After receiving an application and appointment date from the "*A* Receptionist", the next step in the application process is for the interested individual to return to the Income Maintenance center with the necessary documentation for his formal application interview with a specialized "Interviewer". Despite his scheduled appointment, an applicant may be refused an interview because the "Interviewer" is behind schedule and completely booked up by the time the applicant arrives for his appointment. This group closing phenomenon was described by Mr. Burdick during the following dialogue at trial:

"Q The applications interviewers, are they assigned to groups?

"A Yes.

"Q Was there ever a time that those groups had sufficient numbers of persons so that they could not see any further persons on a particular day?

"A That is generally true today, which is the issue of making future appointments for persons who have come in . . . ." (Transcript at 568).

Defendants assert that when application interview groups reach full capacity on any given day, future appointments are regularly scheduled. (Defendants' Post-Trial Memo. at 26). It is undisputed that the agency is unable to keep interviews current with application requests.[13] Because the average number of interviews conducted per day is two and one-half, it is not surprising that this frequently occurs. (Transcript at 493).

It is obvious that the magnitude of the demand for welfare assistance, in its ever-increasing pattern, bodes ill for public treasuries. It would be quixotic to expect that cities compelled to lay off thousands of employees could nevertheless easily absorb the administration of the surging cries for welfare. Some waiting period for public services, including the procurement of an application form from the receptionist at an Income Maintenance center is inevitable under present conditions and cannot be held to constitute a violation of the federal regulatory scheme. The system envisioned by its draftsmen must be seen in the real light of today. A sanguine prospect appears in the expansion of alternate locations for distribution of application forms. As mentioned earlier in this opinion, and suggested by the Court at trial, making applications readily available in locations accessible to the relevant public would presumably ameliorate the congestion and the waiting times at the welfare centers.[14]

---

13. Numerous exhibits containing statistical reports charting the activity at the diverse centers were submitted into evidence in support of this fact.

14. *See* Transcript at 481–91. At the time of trial, Mr. Burdick recounted approximately thirteen or fourteen outside agencies which participated in the distribution of applications. A successful effort would depend upon widespread publicity of such alternative locations for obtaining application forms. Evidence at trial failed to indicate adequate publicity of the alternate procedures.

As with the pre-screening process, the Court cannot find a "denial" of the opportunity to apply for assistance in the situation arising where application groups close. As long as the individual has the opportunity to obtain an application form upon request at the Income Maintenance center, he has the "opportunity to apply" for assistance. The evidence introduced by plaintiffs does not substantiate their claim that they are *prevented* from obtaining application forms. Albeit an inconvenient, inopportune, and even inauspicious procedure, an application is not denied to the would-be applicant who asks for one. Plaintiffs rely on certain administrative reports stating that substantial numbers of applicants had to return to the centers numerous times in order to complete the application process. However, *completion* of the application process is distinguishable from granting the opportunity to initiate the application process. Admittedly, the application process often cannot be completed in one step. Lamentable as this may be, it is not tantamount to a denial of the opportunity to apply. It must be recognized that certain budgetary limitations will impair optimal operation of the welfare center, but these are not necessarily prohibitive. Some delay and inconvenience may be inevitable. This fact alone does not constitute a *denial* of welfare services. In discussing administrative actions required by due process (which will be noted further), the Supreme Court recently sanctioned consideration of financial costs imposed by additional administrative burdens.

"[T]he Government's interest, and hence that of the public, in conserving scarce fiscal and administrative resources, is a factor that must be weighed. At some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost." *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 909, 47 L.Ed.2d 18, 41, 44 U.S.L.W. 4224, 4233 (1976).

### D. *Unlawful Delay in the Opportunity to Apply*

The statute requires that there be an opportunity to apply for assistance. The implementing federal regulation directs that that opportunity be afforded without delay. Even though there is no *denial* of the statutory entitlement, the delay indigenous in the various steps of the multistage application process suggests a transgression of the federal regulatory scheme.

Actual delays occur at three phases: (1) delay in obtaining the application form and interview appointment due to the pre-screening procedure; (2) delay in obtaining the actual interview; and (3) delay resulting from the DSS practice of not accepting applications for filing prior to the actual interview.

As mentioned previously, 45 C.F.R. § 206.10(a)(1) dictates that the opportunity to apply be afforded to the individual without delay. The individual has the opportunity when he can initiate the process for ascertainment of his eligibility for public assistance. This opportunity may not be thwarted by "delay", as that term may be defined.

The Court has found that the individual wishing to apply for welfare is not *precluded* from going to a center and requesting an application, although he may have to wait on line for a long time before getting one. As noted earlier, the great public demand for welfare compounded with city budgetary restrictions on hiring additional staff make some delay inevitable. However, this delay would not necessarily *deprive* persons of the opportunity to apply for welfare. The Court has already indicated the advantages of dispersing locations where application forms are available. Potential applicants could pick up the forms at their convenience with the least hardship, without having to go to a specific Income Maintenance center during crowded weekday work hours. Furthermore, with the congestion reduced by the number of people just waiting to pick up applications, the waiting time should likewise diminish.

The delay between receipt of the appointment at the pre-screening stage and the subsequent formal interview presents a more egregious problem. Since applying for welfare is a multistage process, it cannot be completed in one instance. An individual has the opportunity to initiate the application process when he first obtains an application form. Next there is a lapse in time before his interview when he may file his application, thereby completing his application endeavor.

Evidence revealed an average waiting time of 7.7 work days between receipt of an appointment and the formal interview. (Plaintiffs' Exhibit 66). In some cases, the waiting period translated into several weeks on the calendar. Depending on the length of the wait, the delay in completion of the application process due to administrative difficulties can in fact amount to a violation of the federal welfare scheme.

Although the federal regulations specify maximum time limits for action on applications, 45 C.F.R. § 206.10(a)(3), no time is specifically set forth for granting of the interviews to applicants. The absence of a time schedule for completion of the protracted application process permits the Court to infer a legislative intent to allow some flexibility to accommodate the individual needs of local agencies. The flexibility which may allowably be read into construction of the term "delay" must still be governed by what is reasonable. Just as the notion of "reasonable promptness" eludes a precise definition (hence the need for enunciated limits in 45 C.F.R. § 206.-10(a)(3)), the phrase "without delay" may be construed as some time shorter than one that is reasonably prompt.

Taking cognizance of the fiscal realities of the City of New York, this Court holds that one week from the time an individual receives an appointment is the maximum delay allowable before a formal application interview must be held. Any period longer than a one week waiting period must be deemed a delay in violation of 45 C.F.R. § 206.10 whose directions implement the statutory mandate of the Social Security Act.

There is an alternate method by which the City and State agencies can comply with the requirements of the statutory scheme as construed by this Court. An equally satisfactory procedure would be a policy of accepting applications for filing when they are completed by the potential applicant, even *prior* to the formal interview.

New York State law provides that the effective date of an application for assistance is the date on which the application is filed.[15] Because there may be substantial delay before the interview transpires and again before eligibility is determined, the potential applicant has a great interest in having his application filed as early as possible. The Court finds no convincing explanation why a completed application should not be accepted for filing in advance of the formal interview.

Scant evidence was adduced on the issue at trial. Mr. Burdick responded to questioning as follows:

"Q  Is it permissible under your procedures for an individual to file that application form prior to his scheduled interview?

.    .    .    .    .

"THE WITNESS: There is nothing in our procedures which would prohibit the early filing of an application. I do not believe that it is the general practice and I know of no instance where applicants try to file an application and been denied the right to file the application; nor do I know of any instance in which an applicant tried to file and successfully been allowed to file prior to the date of appointment.

"Q  Isn't it true that your procedures, the procedure 73–12 now in evidence, calls for the person to return to the Center with the application form and supporting documents?

"A  Yes, it does.

**15.**  18 N.Y.C.R.R. § 351.8(c)(2).

"Q Does it provide for the acceptance of an application form at any earlier time?

"A The procedure does not.

"Q Are there any other procedures which do?

"A No." (Transcript at 587, 590–91).

Premature acceptance of applications is logically justified. A ministerial stamping of a submission date by the pre-screener who finds the application complete and schedules the future appointment would suffice, entailing minimal administrative inconvenience. If the individual is ultimately found ineligible, nothing is lost by this procedure but the ink on the stamp. If he is found eligible, his payments would be retroactive to the date of the application. In this manner, the applicant can receive benefits from the time he completes and files his application. Theoretically, his opportunity to apply for assistance is not delayed when he can control the effective date of his benefits by submitting his completed application for filing at a time of his choice. Furthermore, retroactive benefits would cure any hardship resulting from the lapse in time between issuance of the form and the subsequent formal interview. Finally, allowance of premature filing should eliminate some of the pre-dawn rush to welfare centers, and thus ameliorate the congested conditions.[16]

█ It is clear, however, that the current practice of not accepting applications for filing prior to the formal interview has the effect of an unlawful denial of the opportunity to apply for assistance *without delay*. Even though this is not official agency policy, the practice contravenes the federal scheme set forth in 45 C.F.R. § 206.-10 *et seq.*

### E. Due Process Claims

Plaintiffs claim that the Due Process Clause of the Fourteenth Amendment is violated as a result of all the delays and denials alleged above. The Supreme Court has recently enunciated the standard for examination of due process claims in the context of procedural safeguards for administrative actions:

"[D]ue process generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge, supra,* 424 U.S. 335, 96 S.Ct. at 903, 47 L.Ed.2d at 33, 44 U.S.L.W. at 4229.

█ It is well established that public assistance benefits are statutory entitlements within the ambit of due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution. *Goldberg v. Kelly,* 397 U.S. 254 and 262 n. 8, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287, 295; *Barnett v. Lindsay,* 319 F.Supp. 610 (D.Utah 1970) (three-judge court). In *Goldberg,* the recipient's interest in continued welfare payments was deemed sufficiently fundamental to bar termination without a prior evidentiary hearing. Due

16. Of course, applicants would continue to go to the Income Maintenance centers in order to file the applications and schedule interview appointments. As discussed earlier, other administrative procedures could be explored for expediting activities. Pre-screening reception of potential applicants could be staggered alphabetically, for example, or categorically (*see* Transcript at 488–89 explaining that this has been attempted), or according to any method capable of dividing people into small groups, such as zip code or date of birth designations.

Obviously, the method of operation would have to be broadly publicized so that potential applicants receive notice of the procedures to follow. These procedures could easily be detailed in the application form and accompanying instructions. Of course, it is the responsibility of the agency—not the Court—to develop techniques adaptable to efficient operation of the welfare system, but these suggested methods indicate that alternative operations are certainly possible.

process mandated that the individual have an opportunity to preserve the status he reasonably expected to maintain. *Cf. Richardson v. Belcher,* 404 U.S. 78, 81, 92 S.Ct. 254, 257, 30 L.Ed.2d 231, 234 (1971). This is distinguishable from the situation where administrative action does not involve an unwelcome change of status. *Cf. Richardson v. Perales,* 402 U.S. 389, 407, 91 S.Ct. 1420, 1430, 28 L.Ed.2d 842, 855 (1971). In *Barnett v. Lindsay, supra,* 319 F.Supp. at 612, the court held that due process prohibited the summary denial of welfare without prior notice or the opportunity for a hearing consistent with *Goldberg v. Kelly* standards for termination of aid.

The interest in dispute is not entitlement to welfare, but one's entitlement to a determination of qualification for assistance. Plaintiffs assert that the issue is access to welfare and that "access to a protected interest" must be protected by the same procedural standards as maintenance of the interest itself. In *Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1970), the Supreme Court held that due process of law would be offended where otherwise valid State restrictions had the inevitable effect of foreclosing the means for assertion of a protected interest. Administrative action was deemed "the equivalent of denying [individuals] an opportunity to be heard upon their claimed right . . . , and, in the absence of a sufficient countervailing justification for the State's action, a denial of due process." *Id.* at 380–81, 91 S.Ct. at 787, 28 L.Ed.2d at 120.

The Court concluded that the minimal State expenditure necessary did not justify the particular administrative requirement. Furthermore, the Court emphasized the limited parameters of its ruling. Only where the State had exclusive control over the right involved (dissolution of marriage) would due process prohibit any restriction on access to its adjustment. *Id.* at 382–83, 91 S.Ct. at 788, 28 L.Ed.2d at 121–122.

▮ Thus where a benefit receives Fourteenth Amendment protections, due process will in certain instances forbid official action which inexorably deprives some-

one of the opportunity to assert his entitlement to the protected benefit.

▮ The instant case presents a distinguishable situation. The Court has found that the practices of the DSS may delay the application for welfare benefits, but it does not preclude anyone from making the application. The procedures do not cause a "deprivation of such interest," *Mathews v. Eldridge, supra,* 424 U.S. at 335, 96 S.Ct. at 903, 47 L.Ed.2d at 32, 44 U.S.L.W. at 4229, which in this case is the plaintiffs' entitlement to a determination of eligibility. In addition, the unlawful delay, although not reaching constitutional proportion, is such that it may be easily cured by the early filing of applications, a procedure which protects the individual's interest from the time he completes his part of the process.

### F. Corrective Actions by the Agencies

Admittedly, the agencies have tried several methods to improve the onerous conditions currently existing at welfare centers. Such efforts, including an extended hours program and an unenthusiastic attempt to provide alternate centers for distribution of applications, have had little effect in ameliorating conditions. Although the Court cannot direct new procedures to be followed by the agencies possessing the putative expertise in social services distribution, it does find that the agencies have not met the challenge of their public responsibilities.

### IV. Conclusions

The Court finds that the statute and regulations thereunder require that plaintiffs be able to pick up application forms within a reasonable time after they attempt to do so, specifically, on their first or second visit to an Income Maintenance center for that purpose. This mandate can be complied with in the alternative by assuring the readily accessible distribution of application forms at additional convenient locations.

Secondly, the Court orders that comprehensive intelligible instructions accompany

the applications so that the applicant can complete the forms without necessitating the help of Income Maintenance center personnel. In this way, it is within the would-be applicant's control to return a completed application at his convenience.

Furthermore, any delay between the time an appointment is given to the applicant by the pre-screener and the interview itself which is greater than one calendar week will be deemed unlawful and in violation of the federal scheme. The Court orders that a potential applicant be scheduled for an interview within one week of obtaining the application form, his initiation of the application process.

An acceptable alternative to the one week time limit on administrative delay is enactment of a procedure permitting individuals to submit properly completed application forms for filing prior to the formal interview. If this practice is adopted, the lawful waiting period may extend longer than one week, but not longer than thirty calendar days.

The Court does not direct that an application be given automatically to every person entering an Income Maintenance center, but it does direct that the availability of applications upon request be adequately publicized so that persons coming to the centers may be informed that they are entitled to receive applications.

The Court finds that the determination of presumptive eligibility in the pre-screening procedure does not violate the statutory scheme although elimination of that procedure certainly appears to be a more prudent allocation of agency resources.

The Court does not find that congestion at the centers amounts to unlawful deterrence of potential applicants.

This opinion constitutes the Court's findings of fact and conclusions of law. Accordingly, defendants are directed to submit proposed orders outlining plans for revision of their procedures in conformity with this decision within thirty days.

So ordered.