Arlene **KESSLER**, Richard Arena, and Margeritha Cameron, individually and on behalf of all others similarly situated, Plaintiffs,

v.

Barbara **BLUM**, individually and in her capacity as Commissioner of the New York State Department of Social Services; Russell Schwartz, individually and in his capacity as Deputy Commissioner for the Medical Assistance Division of New York State Department of Social Services; Robert Crane, individually and in his capacity as Director of the Office of Health Systems Management of the New York State Department of Health; James A. Krauskopf, individually and in his capacity as Commissioner of the New York City Department of Social Services, defendants.

No. 82 Civ. 4576(RWS).

United States District Court, S.D. New York.

July 10, 1984.

Brooklyn Legal Services Corp. Brooklyn, N.Y., for plaintiffs; John C. Gray, Jr., Jane Greengold Stevens, Ruben Nazario, Brooklyn, N.Y., of counsel.

Robert Abrams, Atty. Gen. of the State of N.Y., New York City, for State defendants; Melvyn R. Leventhal, Deputy First Asst. Atty. Gen., Judith A. Gordon, Marion R. Buchbinder, Asst. Attys. Gen., New York City, of counsel.

## OPINION

SWEET, District Judge.

This is a class action for declaratory and injunctive relief pursuant to 42 U.S.C. § 1983. The plaintiffs and the proposed plaintiff-intervenors are all New York State Medicaid recipients. The defendants are New York State and City officials charged with administering the prior approval program for providing certain medical care and services for Medicaid recipients.

Plaintiffs have moved for partial summary judgment under Fed.R.Civ.P. 56 and for class certification under Fed.R.Civ.P. 23(a). Plaintiffs have also moved to add additional defendants pursuant to Fed.R.Civ.P. 20 and 21. The parties are in agreement that no factual issues are presented by the pending motions, but they seek relief supported by sharply opposing views of the result required by the relevant authorities as a consequence of the facts presented. The plaintiffs seek reform of certain state practices in connection with the prior approval program for certain services and supplies

provided to Medicaid recipients, the defendants seek dismissal.

On the facts and conclusions stated below, the motion for intervention is denied; the motions for class certification and joinder of additional defendants are granted. Plaintiffs' motion for partial summary judgment is granted on certain of their claims, others will be dismissed.

**The Issues**

These motions present a "systemic" challenge to the "prior approval process" operated by the New York State Department of Health ("DOH") under the general supervision of the New York State Department of Social Services ("DSS"). The plaintiffs and plaintiff-intervenors seek declaratory determination that the defendants have violated federal and state statutes and regulations and the United States Constitution by (1) prohibiting applicants and recipients of Medicaid from directly requesting prior approval, (2) failing to give notice to Medicaid applicants and recipients of the filing of requests for prior approval by providers, (3) failing to give notice of decisions approving or modifying prior approval requests and of the right to appeal modified requests, (4) failing to include in the notice of decision notification of the right to a conference and the right to request a consultative examination, (5) failing to mail to individuals requesting hearings on prior approval issues copies of the exhibits on which the agency intends to rely at the hearing, (6) failing to promulgate and comply with time limits within which decisions must be made on requests for prior approval, (7) failing to promulgate and comply with procedures for expedited approval of emergency prior approval requests, and (8) failing to make and to publish written procedures for making and appealing requests for prior approval. Appropriate relief is requested.

According to the defendants, the plaintiffs and proposed intervenors do not have standing, the interventions should be denied, and the class is overbroad and fails to meet the requirements of Fed.R.Civ.P. 23(a)(2) and (3). The defendants also contend that the prior approval procedures meet all federal and state requirements, the applied standards are appropriate, notice is not required, conference rights and consultative examinations and copies of state exhibits are not required, the response time for complying with requests under the current system meets all relevant requirements, and no change in the emergency procedures is mandated by the authorities.

The State defendants have signed a stipulation of partial settlement under which DOH has agreed to provide notices of decisions and fair hearing rights to recipients when prior approval requests are denied or are modified by DOH in such a manner that the recipient will not receive the service or supply requested. Those modifications which generate a notice pursuant to the stipulation are modifications which:

1. Approve less costly alternative (e.g., same service, but made of different materials; generic versus brand name).; 2. Approve different service than requested (e.g., dentures versus multiple reconstruction; manual wheelchair versus electric); 3. Approve part of mix of services (e.g., certain dental care); 4. All out-of-state modifications; 5. Different amount of service approved within time period requested; 6. Approve service, but change reimbursement level and are not confident service will be delivered.

**The Statutory and Regulatory Scheme**

The Medicaid program, 42 U.S.C. § 1396 *et seq.,* is a joint federal and state medical assistance program for needy people. It is administered by the states pursuant to state plans which have been approved by the Secretary of the Department of Health and Human Services as complying with 42 U.S.C. § 1396a, which requires that state medicaid plans:

provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan (including but not limited to utilization review plans as provided for in

section 1396b(i)(4) of this title) as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care.

DSS has been designated as the "single state agency", 42 U.S.C. § 1396a(a)(5), to supervise the administration of New York's state plan. *See* New York Social Services Law § 363–a(1).

The first area of Medicaid administration is the determination of those persons who are eligible to receive Medicaid. The eligibility standards, which are based on factors such as age, receipt of public assistance, and income, are set forth in New York Social Services Law § 366 and in 18 NYCRR § 360.1 *et seq.* New York's 58 local social services districts (one for New York City and one for each remaining county in the State), which are supervised by DSS, are responsible for making the above eligibility determinations.

All persons who apply for Medicaid at their local social services district are given an informational pamphlet, published by DSS, which provides a general explanation of New York's Medicaid program and answers the questions most frequently asked by persons applying for Medicaid. The pamphlet explains that Medicaid covers "necessary services provided by physicians, dentists, optometrists and other professional personnel," that dental services paid for by Medicaid are "ordinarily limited to essential treatment, such as extraction of teeth, filling of cavities, and routine preventive dental care," but that other dental services "required to alleviate a serious health condition" will be paid for if prior approval has been obtained, that Medicaid pays the provider of medical services or supplies and does not pay cash benefits to recipients, and that Medicaid will pay only for services and supplies not covered by third party payers, such as Medicare. The pamphlet advises anyone who wants guidance in his own situation or additional information to contact his local social services department.

The second area of Medicaid administration is the payment of claims for medical services rendered to persons who have been determined to be Medicaid eligible. Pursuant to federal law, payments must be made to the person or entity providing the service or supplies (*e.g.,* physicians, optometrists, vendors of medical equipment, etc.) unless, in the case of physicians' and dentists' services, the state plan permits payment directly to the recipient. In all cases, payment for medical services provided to Medicaid recipients who also received assistance under other titles of the Social Security Act, *e.g.,* the Supplemental Security Income Program ("SSI"), Title XVI; Aid to Families with Dependent Children ("AFDC"), Title IV–A, may only be made to the providers of those services and supplies. New York's state plan requires that payment be made only to providers.

Pursuant to New York Social Services Law § 367–b, DSS has contracted with Mc Auto Systems Group, Inc. ("Mc Auto") to process and pay claims for medical services and supplies provided to Medicaid recipients. In order to receive payment for services rendered to Medicaid recipients, the provider enrolls in New York's Medicaid program, and receives a provider number, a provider manual, and claim forms. The provider manuals, supplied to the local social services districts, instruct providers how to operate within New York's Medicaid program. There are separate manuals for different types of services and supplies.

When an in-state provider, or an out-of-state provider who has enrolled in New York's Medicaid program, renders a service or provides equipment or supplies, he/she submits a claim form to Mc Auto. If the form is properly completed, and the service or supply was rendered to a Medicaid recipient, Mc Auto then pays the provider, subject to post-payment review. If an out-of-state provider who is not enrolled in New York's Medicaid program renders a service or supply to a New York Medicaid recipient, he/she submits the bill to the DSS out-of-state billing office.

The third general area of Medicaid administration is the setting of standards for the medical care and services provided. The general standard for the medical services and supplies reimbursable under Medicaid are those "which are necessary to prevent, diagnose, correct or cure conditions in the person that cause acute suffering, endanger life, result in illness or infirmity, interfere with his capacity for normal activity, or threaten some significant handicap." New York Social Services Law § 365–a(2).

Pursuant to New York Social Services Law § 364–a, DSS has entered into a cooperative agreement with DOH under which DOH has the responsibility for developing standards for the medical care and services provided under Medicaid. The agreement requires DSS to approve and promulgate regulations embodying the standards for non-institutional medical care certified to DSS by DOH. The agreement further provides that DOH is responsible for enforcing the standards promulgated in the DSS regulations. The standards certified by DOH have been promulgated as regulations by DSS, and are published at 18 NYCRR § 505.1 *et seq.* The standards are also set forth in the provider manuals.

The cooperative agreement between DSS and DOH also requires DOH, subject to consultation and periodic review and evaluation by DSS, to establish, maintain, and implement a plan for continuing review of the utilization, appropriateness and quality of care and services furnished to New York Medicaid recipients. Pursuant to this requirement, DOH, in consultation with DSS, has determined that certain medical services and supplies provided to Medicaid recipients by non-institutional providers require "prior approval."

## The Prior Approval System

"Prior approval" is a pre-service determination that services and supplies proposed to be provided to Medicaid recipients come within the standards set forth in the New York Social Services Law, DSS regulations and provider manuals. If approval was not obtained before the service or item was supplied to a recipient, a provider may not be reimbursed. A general description of the services and supplies which require prior approval is set forth in 18 NYCRR § 505.1 *et seq.* and in the provider manuals.

The specific items in each provider category which require prior approval are indicated in the billing section of the provider manuals. Every item or service provided under Medicaid has a five or six digit billing code, and if an item or service requires prior approval, that fact is noted at its billing code. Each provider manual contains an identical "Inquiry" section, which contains the telephone numbers and addresses for requesting prior approval and general medical review information, and has a section containing detailed instructions concerning the information required to obtain prior approval.

Although a service may normally require prior approval, there is no prior approval requirement in emergency situations. As defined in the general policy sections of the provider manuals, an "emergency" is "care for patients with severe, life-threatening, or potentially disabling conditions that require immediate intervention." Whether an emergency exists is decided by the recipient's provider, as the provider is the only person who sees the patient. Additionally, in the dental area, which has many services requiring prior approval, palliative treatment of dental pain while awaiting a required prior approval for other treatment of the affected tooth does not require prior approval (for example, opening into root canals for sedation or drainage prior to approval for root canal therapy does not require prior approval).

There are many reasons why prior approval is required for a given item or service, all of which are related to quality of care considerations and/or cost control. Some items require prior approval because they also have non-medical uses. Other items and services require prior approval to ensure that they are medically necessary and that there is no equally effective less expensive alternative. In some instances, prior approval is required because a medi-

cally necessary item may be inappropriate or harmful to the patient in certain situations. In some cases, the necessity for prior approval depends on the professional qualifications of the provider prescribing it.

The Bureau of Ambulatory Care Services of the Surveillance Group, DOH Division of Health Facilities Standards and Control, is responsible for overseeing the staff in the six DOH area offices which make prior approval determinations for medical services (except personal care services) and supplies to be provided to Medicaid recipients in non-institutional settings, and for prior approval of private duty nurses at home or in the hospital. DSS has general supervisory responsibility but becomes directly involved with the prior approval process only when a problem is brought to its attention by a provider, a recipient, or DOH.

Prior approval requests for medical supplies and equipment require a statement of the primary and secondary diagnoses, a detailed description of the equipment or supply ordered and the medical reason why the item is necessary. Prior approval requests for physicians' services require a description of the primary diagnosis or illness requiring treatment, a description of any secondary diagnosis or illness which may affect the course of treatment, and a treatment plan describing the nature of the illness, prognosis, treatment goals, as well as supporting documentation when appropriate. Prior approval requests for dental services require a dental chart showing the recipient's present dental condition and the needed treatment.

DOH has issued an Area Office Procedures Manual. The manual describes the "flow" of prior approval requests within the area office and establishes record-keeping requirements. New York City, which was the first district to come under DOH prior approval authority, has a significantly higher volume of prior approval requests than the other DOH offices and has developed its own DOH-approved procedures manual. The DOH area offices have developed their own variations on the DOH Procedures Manual based on their own experi-ence and needs. The area offices also have in-house procedures, where necessary, for anything beyond what is covered by the Procedures Manual.

In some DOH area offices prior approval requests may be granted by non-medical administrative personnel. However, all prior approval requests must be reviewed by a professional peer reviewer ( e.g., a dentist reviews dental requests, an optometrist reviews optometry requests) before they are modified or denied. Each area office has a lead physician and a lead dentist who answer questions the professional peer reviewers may have about a particular request. If the lead physician or dentist is unable to answer the reviewer's questions, he/she contacts the DOH Bureau of Standards Development in Albany. The Bureau employs physicians and dentists who have established contacts with outside professionals and recognized experts in the various medical fields.

The standards to be used in making prior approval determinations are the same standards used for the provision of all supplies and services under Medicaid. The determination of what proposed services or supplies are or are not "medically necessary" in a given case is based on the totality of the factual circumstances, including the diagnosis, prognosis, and what has previously been tried. If the information submitted by the provider does not contain sufficient information concerning the recipient's condition to allow the reviewer to determine whether the requested item is medically necessary, the reviewer requests additional information from the provider. In reaching their determination of whether an individual prior approval request falls within the general Medicaid standards, DOH professional peer reviewers are expected to rely on their professional expertise, relevant guidelines of the American Medical Association and other recognized professional standards.

Compared to other areas of Medicaid coverage, the dental services for which Medicaid reimbursement is available are limited, whether or not the dental service requires

prior approval. The detailed standards used in reviewing dental requests are set forth in the Dental Provider Manual, and leave little discretion with the DOH reviewing dentists.

In addition to determining whether the requested services should be approved, denied, or modified, the DOH reviewer also reviews the requested price to make sure that it conforms to the allowable price set forth in the provider manuals and determines whether rental or purchase of equipment is appropriate. Additionally, DOH reviewers determine whether the time period for which a service or supply is prescribed is appropriate, and they may initially approve the service or supply for a shorter period than requested, subject to extension by a renewed prior approval request.

The usual procedure for initiating prior approval requests (except in the pharmacy and dental areas) is the submission, by the requesting provider, of a prior approval form. (There is no form for out-of-state services; written prior approval requests for such services are made by letter). In all non-dental cases (except some out-of-state cases) DOH prior approval determinations are based solely on medical information supplied by the provider and the information contained in the recipient's Medicaid file.

A second opinion is sometimes sought on requests for out-of-state physicians' services to determine whether the recipient can receive all necessary medical services within New York. In the New York City Area Office, the second opinion is requested from a physician who, at a minimum, holds the rank of assistant professor at one of New York City's medical teaching institutions and who is board certified in the relevant medical specialty area. The consulting physician either reviews the recipient's medical record or, if necessary, examines the recipient at DOH expense.

Prior approval examinations for dental requests are held in dental clinics operated by DOH solely for that purpose (the DOH clinics do not provide dental treatment).

The New York City Area Office currently requires a DOH dental examination for approximately 90% of all dental requests. Beginning in April 1984, at the request of the DOH Bureau of Ambulatory Care Services in Albany, about 35% of the dental requests will no longer require a DOH examination and will be reviewed solely on the basis of medical information supplied by the recipient's dentist and in the recipient's Medicaid case file.

Under the procedures followed by the New York City Area Office, if a recipient does not appear for a scheduled DOH examination, the provider is notified of that fact and advised to call for a new appointment. If the provider had sent a prior approval form to DOH, it is returned to him. Re-evaluations are available, at the provider's request, for recipients whose prior approval request is denied or modified by the New York City Area Office on the basis of a DOH examination. The recipient is re-examined by a DOH dentist other than the one who originally examined him/her.

Although a written prior approval form must be submitted to Mc Auto for payment purposes, each DOH area office makes prior approval determinations by telephone on all requests from pharmacies. Decisions on telephone prior approval requests are made on the day the request is received. Because Mc Auto (the DSS Medicaid billing agent) must receive a completed prior approval form before it will pay the provider for an in-state service, drug, or equipment requiring prior approval, all in-state providers must submit a prior approval form for the reviewer's signature after a verbal prior approval has been given. The New York City Area Office has a standard procedure for expedited telephone approvals for medical equipment and supplies. In addition, out-of-state providers often make telephone prior approval requests for non-emergency surgical procedures which must be performed within a limited period of time.

If an in-state prior approval request is approved, the DOH area office notifies the provider and Mc Auto. The provider then

knows that reimbursement will be paid for the service or equipment provided. At that point DOH has no further pre-service involvement. Once prior approval has been granted, the procedure is the same as if prior approval had not been necessary, *i.e.*, it is up to the medical professional or vendor to provide the service or supply to the recipient.

DOH requires the area offices to submit monthly reports to the DOH Bureau of Ambulatory Care Services in Albany. The monthly reports must contain such information as the number of prior approvals received in each provider category, their dispositions, and the average turn-around time from the date the request is received until the date it is approved, denied, modified, or returned to provider for additional information. For the year July 1, 1981— June 30, 1982, the average turn-around time for prior approval requests submitted to the five upstate DOH area offices ranged from 1 day for pharmacy requests to 10.4 working days for dental requests. For the same year, the average turn-around time for prior approval requests received by the New York City Area Office ranged from 1 day for pharmacy requests to 15 calendar days for requests for physicians services. In the first eight months of 1983, the average turn-around time for all DOH area offices ranged from 1 day for pharmacy requests to 9.1 days for dental requests.

Unlike the five upstate area offices, the New York City Area Office does not report turn-around time for podiatry requests as a separate category but includes the podiatry statistics with the turn-around time reported for durable medical equipment. Because the New York City Area Office receives few prior approval requests from podiatrists, its podiatry reviewer is retained to review requests at the area office on a monthly basis. However, the New York City Area Office, in consultation with the DOH Bureau of Ambulatory Care Services in Albany, is scheduled to implement a new procedure in mid-April 1984 to ensure that podiatry requests are reviewed in a more timely manner. Under the new procedure, all podiatry prior approval requests received during a given week will be sent to podiatry consultants at the end of the week.

DSS provides fair hearing for recipients aggrieved by DOH prior approval determinations. DSS does not require DOH to provide conferences with recipients aggrieved by DOH prior approval determinations. DOH area offices are not staffed in such manner as to handle such conferences, and a meeting between recipients and DOH professional reviewers would significantly lengthen the time the reviewer takes to render determinations on pending prior approval requests.

Defendants do not allow individual patients to apply directly for prior approval; they provide no notice to applicants of approval or denial of requests for prior approval. There are no notice of appeal rights for denials, and there are no published rules or procedures or standards by which the defendants make decisions on requests for prior approval. Moreover, there are no time limits within which such decisions must be made and no formal provisions for expeditious prior approval in emergency situations.

### The Operation of Prior Approval System with respect to the Plaintiffs and Proposed Intervenors

#### Plaintiff Arlene Kessler

The New York City Area Office of the DOH first received a prior approval request for a hospital bed and a wheelchair for plaintiff Arlene Kessler on April 13, 1982. The request was made pursuant to that office's verbal approval procedure for medical equipment, *i.e.*, the prescribing provider, or his representative, called the New York City Area Office and gave the patient's diagnosis and a description of the equipment for which approval was sought, and a clerical employee recorded the information on a verbal approval form.

Kessler's provider described plaintiff Kessler's diagnoses as bilateral amputee

and Lupus, and requested the following equipment:

1. E & J Primier adult amputee wheelchair with removable desk arms, one arm drive on right, elevating leg rests, DFD cushion, detachable back with turnbuckles on right, dark blue upholstery, model P8 AAU 260–31R–774, price of $1,163.70.

2. E & J over toilet folding commode with detachable arms # 5FC 250–0900, price of $262.80.

3. Electric hospital bed with side rails at price of $1,378.80.

On April 13, Sung Yoo Park, M.D., who is employed by DOH in the New York City Area Office to review prior approval requests for medical supplies and equipment, spoke with Dr. Bernstein, Kessler's prescribing physician, and requested additional information concerning her condition and the medical services available to her. Dr. Bernstein advised Dr. Park that Kessler had received approval from the DSS for a 24-hour home attendant. Dr. Park questioned the need for an electric bed in light of the fact that Kessler had a 24-hour attendant, and Dr. Bernstein agreed that an electric bed was not medically indicated. Dr. Bernstein concurred in Dr. Park's approval of a multiheight (manual) bed instead.

On April 13, 1982, the date the request was received, Dr. Park advised Dr. Bernstein that the purchase of the manual bed was approved and that the purchase of the wheelchair and commode was approved, without modification. Dr. Bernstein thereafter submitted a prior approval form for Dr. Park's signature. The form requested the three items which had been verbally approved on April 13. In addition, the order description included a Lumex tub transfer seat and sliding board. Neither of those items required prior approval, but it is a common practice for the provider to use the prior approval form to order additional items from the vendor.

When Kessler returned home from the Schulman Institute on April 14, 1982, the hospital bed and shower seat had been de-livered. However, Kessler decided that she needed an electric hospital bed, and she was dissatisfied with the Lumex tub transfer seat ordered by Dr. Bernstein. She received the wheelchair in or before May 1982, but special parts were missing. Dr. Bernstein's secretary advised her that the parts were on order from the equipment vendor.

On August 24, 1982, the New York City Area Office received a prior approval request from Claudio Petrillo, M.D., on behalf of Kessler. Dr. Petrillo requested a specified electric bed and an electric wheelchair with no further specification of the wheelchair. The stated justification for both pieces of equipment was that they would allow Kessler to function more independently and with decreased energy expenditure.

Dr. Park reviewed the new request on August 25, 1982, the day after it was received. Upon reviewing Kessler's Medicaid chart, he learned that she was eligible for Medicare Part B, which provides Medicare reimbursement for the type of equipment requested. Medicaid does not cover items for which third party payors, including Medicare, are liable. Dr. Park therefore returned the request to Dr. Petrillo, on August 25, 1982, with the explanation that the request had to be submitted to Medicare.

On September 27, 1983, the New York City Area Office received another written prior approval request on behalf of Kessler. The primary and secondary diagnoses were again listed as bilateral amputee and Lupus. Section 1 of the new prior approval form, completed by Dr. Bernstein, requested a certi-care tub transfer bench and an electric hospital bed. The form also requested a hand-held shower, a reacher, and a safety rail. The latter three items did not require prior approval, and the form indicated that they had already been delivered to Kessler. Sections 2 and 3 of the prior approval form had been completed by the equipment vendor. In addition, the vendor had written, in the space marked "reviewer's comments," "Medicare will

not pay for bed." No reasons for the Medicare denial were given, and no copy of the Medicare denial was submitted.

Dr. Bernstein's letter justifying the new request did not mention the first bed. The only justification given for the new request for an electric bed was that it would allow Kessler greater ease in transfer, positioning, and other ADL activities. Nor did Dr. Bernstein's letter explain why he was requesting a tub transfer bench, when he had previously ordered a tub transfer seat (which serves the identical purpose as the tub transfer bench).

In late August 1983, at the request of the New York City Area Office, counsel for the State defendants had advised counsel for plaintiffs that if Medicare denied funding for Kessler's bed the following information should be submitted to allow DOH to act on Kessler's request:

1. A copy of the Medicare denial, including the reasons for the denial.
2. An explanation of plaintiff Kessler's current medical condition, the current medical services and/or personal care services being provided, and the corresponding need for the equipment requested.

Because Dr. Park knew that Kessler's attorney had been advised that certain information should be included in any new request (and none of it was), he discussed the new request with other DOH personnel in the New York City Area Office and in Albany. The prior approval request was denied and returned to Dr. Bernstein with a cover letter from Ditha Kandel, the New York City Area Office acting Assistant Director for Medical Professional Affairs, explaining the reasons for the denial.

In late November and early December 1983, the New York City Area Office received letters from a social worker and an oncologist regarding the rejection of the third approval request. The letters urged approval of the electric bed to ease the home attendant's burden and explained that the requested tub transfer bench was required because the tub transfer seat had proved unsafe.

By memorandum of December 29, 1983, Dr. Park advised Ms. Kandel that, after reviewing the above described letters, he believed the tub transfer bench should be approved and the electric bed denied. By letter of the same date, Ms. Kandel advised Dr. Bernstein of Dr. Park's decision. Kessler requested a fair hearing to challenge the denial of the electric bed, but the New York City Area Office was advised on January 25, 1984 that the hearing request was going to be withdrawn and the electric bed sought from Medicare. The New York City Area Office has since been advised that Medicare agreed to pay for the bed.

**Plaintiff Margeritha Cameron**

Plaintiff Margeritha Cameron was first seen by Alan Rogoff, D.D.S. on February 28, 1981. Tooth # 14 was treated by Dr. Rogoff on March 16, 1981 and March 23, 1981. Cameron had four subsequent appointments with Dr. Rogoff, the last on April 21, 1981. She did not complain of having any pain from tooth # 14. On May 29, 1981, Dr. Rogoff's secretary completed a prior approval form for root canal therapy for tooth # 14 and subsequently mailed it to the Medicaid office.

Dr. Rogoff received a note from the Medicaid office that a prior approval appointment had been scheduled for Cameron for June 22, 1981. Dr. Rogoff sent Cameron a note informing her of the appointment. On June 20, 1981, Cameron went to Dr. Rogoff's office and told his secretary that she refused to go for the prior approval examination. Dr. Rogoff subsequently received back his originally submitted prior approval form with a letter stating that the scheduled appointment had been broken and advising him to contact Cameron and schedule a new appointment.

In December 1981, Cameron looked for a new dentist and went to the office of Drs. Zweifler and Gentile. On December 15, 1981, Dr. Gentile called the New York City Area Office to schedule a prior approval appointment for Cameron and received an appointment for December 31, 1981. Cameron did not keep the December 31 appoint-

ment, and Dr. Gentile was so notified by the New York City Area Office.

Cameron went back to the office of Drs. Zweifler and Gentile in May, 1982. The receptionist called the New York City Area Office and made a prior approval appointment for Cameron for one week later, on May 20, 1982. Cameron kept the May 20 appointment, bringing the prior approval form with her. She was examined by Dr. Parnes, a DOH dentist, who denied the prior approval request on that date. The reason for the denial, set forth on the prior approval form, was that the tooth was extruded and there was no opposing lower tooth. The New York City Area Office returned the denied prior approval form to Dr. Zweifler, who notified Cameron.

On July 6, 1982 the New York City Area Office was notified by the DSS that Cameron had requested a fair hearing to contest the denial of root canal therapy. Because Cameron's dentist had not requested a re-evaluation, Cameron was asked to come to the New York City Area Office prior to the hearing. Drs. Rein and Westerfeld examined her mouth at that time and agreed that the request was properly denied. The hearing was held on July 28, 1982. Dr. Westerfeld appeared on behalf of DOH to explain why the request was denied. By decision dated August 6, 1982, DSS affirmed the denial.

**Plaintiff Richard Arena**

On February 26, 1980, the New York City Area Office received a prior approval request for "Bragg Peak Proton Beam Therapy for Arteriovenous Malformation of the Brain" on behalf of plaintiff Richard Arena. The request was submitted by Raymond N. Kjellberg, M.D., the out-of-state doctor who was to perform the procedure. Three days after receipt of the request, Florica Ettinger, M.D., the New York City Area Office professional reviewer for prior approvals for physician's services, approved the request and so advised Dr. Kjellberg by letter dated February 29, 1980. Dr. Ettinger's letter further advised Dr. Kjellberg that his requested fee could not be guaranteed and advised him to contact the division of DSS concerning out-of-state billing. Under 18 NYCRR § 527.1(3), charges for out-of-state services are held to fees applicable to in-state providers if the out-of-state provider is considered to be within the "usual medical marketing area" of the recipient's community. If the out-of-state provider is not within the "usual medical marketing area," 18 NYCRR § 527.1(3) provides that the out-of-state provider will be reimbursed "charges as billed."

On February 10, 1982, the New York City Area Office received a letter from Vallo Benjamin M.D., Arena's in-state physician. Without referring to the first prior approval request, Dr. Benjamin's letter requested approval of the same out-of-state service. Dr. Ettinger responded to the new request on the date it was received, asking for additional information and again stating that the fees requested by Dr. Kjellberg could not be guaranteed.

The New York City Area Office received additional medical information on February 26, and by letter of the same date Dr. Ettinger advised Dr. Benjamin that, upon reviewing the New York City Area Office records, she had discovered that approval for the requested procedure had been granted on February 29, 1980, she again stated that Dr. Kjellberg's requested fee could not be guaranteed. DSS subsequently advised the New York City Area Office that Arena had requested a fair hearing concerning the decision on his prior approval request for out-of-state treatment. Since the New York City Area Office had approved that request, and Arena's attorney had been advised that out-of-state billing was the function of DSS, the New York City Area Office advised DSS that it would not send a representative to the hearing. The New York City Area Office was thereafter notified that DSS had settled a state court proceeding brought against it by Arena by agreeing to authorize $3,050.00 in Medicaid reimbursement for Arena's out-of-state treatment.

## Proposed Plaintiff Paul Marvin

The New York City Area Office first received a request for custom molded shoes for proposed plaintiff Paul Marvin on July 13, 1983. The request, submitted by Marvin's podiatrist, stated that Marvin's primary diagnosis was hammertoes, with a secondary diagnosis of hyperkeratosis (corns), and that the condition for which the shoes were requested was not disabling.

On July 19, 1983, six days after the request was received, it was reviewed and denied by Dr. Grinell, the New York City Area Office consulting podiatrist. The stated reason for the denial was "high soft toe box would accommodate the pathology described." Sometime in August, 1983, the New York City Area Office received a request to reconsider the request for custom molded shoes. The request for reconsideration restated that Marvin had hammertoes, added that he had occasional muscle spasms and a medical history revealing "severe kidney disfunction with associated neuropathies (disorders of the nervous system) in the upper and lower extremeties," and concluded that molded shoes would be "in the best interest of this patient." Dr. Grinell was asked not to come to the New York City Area Office in August 1983 because the office was in the process of changing its location. On September 13, 1983, Dr. Grinell again denied the request, stating "This [patient] can be fitted with a conventional shoe as per given description of the foot pathology."

The New York City Area Office was subsequently advised by DSS that Marvin had requested a fair hearing to contest the denial of the molded shoes. The hearing was attended by William Rowney, an Administrative Assistant in the New York City Area Office. At the hearing, an April 1, 1983 letter from Mark Horwich, M.D. to a Mr. Paul Schwartz at the DSS was submitted, setting forth a complete list of Marvin's ailments, including metabolic bone disease, which had not been disclosed in the prior approval request. And, shortly thereafter, a letter was submitted to the hearing officer on behalf of Marvin by one Stephen A. Paget, M.D., F.A.C.P., stating that the requested shoes were necessary because of the effects of "severe metabolic bone disease," and that in July 1983 Marvin had suffered a stress fracture in his left foot related to that condition. DSS thereafter rendered a decision after fair hearing, reversing the New York City Area Office's determination not to grant the prior approval request for Marvin's shoes.

The shoes requested by Marvin required prior approval because they were prescribed by a podiatrist. The shoes would not have required prior approval if they had been prescribed by an orthopedic physician, surgeon, or physiatrist.

## Proposed Plaintiff Elizabeth Giordano

In September 1981 Marvin Markowitz, M.D. prescribed an Ames Dextrometer for proposed plaintiff Elizabeth Giordano and told her to take the prescription to a surgical supply house. Giordano went to Mayflower Medical Supplies, Inc., where she was told by a Mark Santo that the dextrometer required prior approval.

Giordano thereafter called the New York City Area Office and spoke to Stephen Jacobson, who was at that time responsible for overseeing the daily operations of the Medical Equipment and Supplies Unit of the New York City Area Office. Giordano told Jacobson that she needed prior approval for a dextrometer and asked him how to obtain such approval. Jacobson told Giordano that a prior approval request form had to be completed by her physician and the medical equipment vendor and then submitted to the New York City Area Office.

The average turn-around time for prior approvals within the medical supply unit of the New York City Area Office during the period September 1981 to March 1982 (the month in which the New York City Area Office finally received Giordano's prior approval form) was as follows:

| Month | Calendar days |
|---|---|
| September 1981 | 4 |
| October 1981 | 4 |
| November 1981 | 7 |
| December 1981 | 10 |
| January 1982 | 7 |
| February 1982 | 6 |
| March 1982 | 7 |

and Jacobson denies telling Giordano that it would take six to eight weeks for the New York City Area Office to return the form to the vendor.

Giordano also asked Jacobson whether Medicaid would reimburse her for the machine if she bought it herself. Jacobson advised her that the New York City Area Office could not authorize Medicaid payments to recipients and that if a prior approval request was approved by the New York City Area Office, Medicaid would pay the equipment supply company for the dextrometer, and that she could then ask the supply company to reimburse her.

During the period September 1981—January 1983, Philip Cohen, M.D. was consistently prescribing Medicaid funded supplies for Giordano, indicating that he was her primary physician. Dr. Cohen is enrolled as a provider in New York's Medicaid program.

The New York City Area Office first received a prior approval request for an Ames Dextrometer and related supplies for Giordano on March 25, 1982. The request, which was forwarded to the New York City Area Office by the vendor (Mayflower Medical Supplies) consisted of a prior approval form and a cover letter from the prescribing physician, Philip Cohen, M.D. Section 1 of the prior approval form, completed by Dr. Cohen, contained Giordano's primary and secondary diagnoses (Brittle Diabetes and Hypoglycemia) and requested an Ames Dextrometer (a machine which is used to measure blood sugar), a dextrocheck standard/control (which is used in conjunction with the dextrometer), and an unspecified number of dextrostix and monolet lancets, which are also used in conjunction with the dextrometer (although the lancets also have other uses).

Neither the dextrostix nor the lancets required prior approval. Sections 2 and 3 of the prior approval form were completed by the vendor, and section 3 specified a quantity of 100 dextrostix and 200 lancets. Dr. Park reviewed the request on March 25, 1982 (the day it was received) and in the "reviewer's comments" box on the prior approval form indicated that additional justification was required, including the patient's medical history (whether she had juvenile diabetes, her blood sugar levels, complications, her present method of controlling her glucose levels) and why measurement of blood sugar through urinalysis was inadequate. This information was requested to determine the severity of the diabetes. Sometime thereafter, Dr. Park received the additional medical information, and he approved the request on May 6, 1982.

Sometime thereafter, Giordano called the New York City Area Office and told Jacobson that the supply company had said that it had not been paid for the dextrometer, and it had refused to pay her. Jacobson then advised Giordano to request a DSS fair hearing and to bring with her the receipt for the machine, if she had one, or other evidence of purchase. Jacobson so advised Giordano because, although the New York City Area Office is not permitted by DSS to authorize Medicaid reimbursement payments to a recipient, in another case a DSS fair hearing officer had authorized Medicaid reimbursement directly to a recipient who had proof of payments made. The May 6, 1982 prior approval for Giordano's dextrometer was deleted from the Medicaid billing system on November 14, 1982 because no billing claim had been submitted against it.

Giordano's fair hearing was held in July 1983, and Jacobson attended the hearing on behalf of the New York City Area Office to explain what had happened. However, DSS issued a fair hearing decision denying the reimbursement on the ground that the prior approval request was not submitted until after the dextrometer had been purchased. DSS has agreed to reinstate the prior approval and make payment to Mayflower at the approved Medicaid rate if proper evidence is submitted to DSS that Mayflower has reimbursed Giordano for the amount she paid and Mayflower submits a proper claim form to DSS.

On July 5, 1983, the New York City Area Office received a second prior approval re-

quest for Giordano. The request, submitted by Dr. Cohen, was for an Ames Glucometer, which is the machine Ames now manufactures instead of the dextrometer, and which serves the same function as the dextrometer. The stated justification for the new request was that "patient is an infantile Diabetic who is very brittle and unpredictable changes in blood sugar." Dr. Park denied the request for the Ames glucometer on July 7, 1983, two days after it was received. The reason stated for the denial was that a dextrometer had been given on May 6, 1982.

**Standing**

From this matrix of events, procedures, and regulations it is not easy to discern a square conflict between the interests of each plaintiff and proposed intervenor and the procedures of the defendants resulting in an injury to the plaintiffs sufficient to satisfy the standing requirement that the plaintiff or intervenor "has personally suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979).

Here, the injuries are sufficiently real, delays in obtaining information and decisions which resulted in the deprivation of allegedly necessary medical supplies or treatment for a meaningful period of time. It is the element of causation that is challenged by the defendants. They maintain that whatever the injury in each instance, it resulted not from their procedures but from the failure of others, the providers (Marvin, Giordano), the patient (Cameron), or another agency (Kessler, Arena). Further, of course, the errors here charged are those of omission: failure to permit direct application by patients, failure to send notice of approvals or modifications, as well as denial, failure to state decisional time limits, and failure to provide effective appellate process.

The plaintiffs, citing *Warth v. Seldin*, 422 U.S. 490, 505, 95 S.Ct. 2197, 2208, 45 L.Ed.2d 343 (1975) and *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976), seek to meet this burden by having the court conclude that the delays and confusion visited upon the plaintiffs and proposed intervenors would be redressed by the relief requested. The circularity is apparent and a necessary part of all considerations of standing. *See generally* C. Wright, Law of Federal Courts § 13, at 65–66 (4th ed. 1983) ("It used to be said that to have standing the plaintiff must be able to demonstrate injury to a legally protected interest. Such an approach is demonstrably circular: if the plaintiff is given standing to assert his claims, his interest is legally protected; if he is denied standing, his interest is not legally protected.") (footnote omitted).

In *Simon*, low income individuals and organizations representing them sued the Secretary of the Treasury, challenging an Internal Revenue Service regulation that allowed hospitals to qualify as charitable institutions, and thus be eligible for deductible contributions, even though they did not furnish services to indigents except in emergencies. The Court stated that a plaintiff has standing only if he "has shown an injury to himself that is likely to be redressed by a favorable decision," *Simon*, 426 U.S. at 38, 96 S.Ct. at 1924, and concluded that plaintiffs lacked standing because "[s]peculative inferences are necessary to correct this injury to the challenged actions of petitioners. Moreover, the complaint suggests no substantial likelihood that victory in this suit would result in respondents' receiving the hospital treatment they desire." *Id.* at 45–46, 96 S.Ct. at 1927–1928.

In subsequent cases, the Court upheld standing where it found injury that was traceable to defendants' conduct and likely to be redressed by a favorable decision. *Watt v. Energy Action Educational Foundation*, 454 U.S. 151, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981); *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *Village of Arlington Heights v. Metropolitan Housing Development*

*Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). More recently, in *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), the Court found no standing because the plaintiffs had failed to demonstrate injury in fact. The Court stated, "at an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.'" *Id.* at 758 (citations omitted). While *Valley Forge* and *Duke Power Co., supra*, 438 U.S. at 59, 98 S.Ct. at 2620, seem to indicate that the ability to trace the injury to the challenged action and the likelihood of redress are the same thing, other cases view these as two separate requirements, in addition to the requirement of "distinct and palpable injury." *See Watt v. Energy Action Foundation, supra*, 454 U.S. at 160, 102 S.Ct. at 212; *Theriault v. Brennan*, 641 F.2d 28, 31 (1st Cir.1981); *see also* C. Wright, Law of Federal Courts, *supra*, at 68 n. 43.

■ Certain of the plaintiffs and proposed intervenors have met their burden of establishing that the relief requested, if granted, would have alleviated their injury. To the extent this establishes that their injury is traceable to defendants' conduct or inaction, they have standing to maintain this action.

Kessler was directly injured because she did not have the opportunity to monitor the progress of her prior approval request and to ensure that proof of personal circumstances, like the Medicare coverage, which affected her right to the requested supply, was submitted to DSS. If Arena had received a notice informing him that his request had been approved but that it was approved for payment of only $340 and if the notice had provided him with a complete explanation of his appeal rights, he would have been able to request a fair hearing immediately to challenge the payment limitation, and he would have avoided a 3 year delay that was severely injurious to his physical and mental health.

If Cameron had been allowed to process the request for a root canal by herself, she would have known the purpose of the defendants' dentist appointment. She would have received a letter explaining the requirement of the appointment, and would not have had to rely on the information, or misinformation, provided by her dentist's secretary. Her injury, a delay of months in getting a prior approval decision, was caused by a confusion which resulted from the practices challenged herein, and the relief sought by plaintiffs could have prevented it. However, Cameron twice failed to keep prior approval appointments. When she finally did keep her appointment, which was scheduled for just one week after the request was made, the request was denied on the same day for the stated reason "tooth extruded, no opposing lower." After Cameron requested a fair hearing to contest that denial, DOH provided her with a re-evaluation that resulted in confirmance of the denial. Moreover, the DSS hearing officer upheld the denial based on the strict standards of review which exist for dental services. Any injury she suffered resulted from the failure to notify her of the denials, a defect the defendants have undertaken to cure by their stipulation of partial settlement.

■ Proposed intervenor Giordano, on the other hand, simply found herself in a bureaucratic tangle, resulting not from the prior approval procedures but from a lack of clarity as to what the procedures required. Her failure to receive reimbursement was caused first by the failure of her doctors, both of whom were enrolled as Medicaid providers, to follow the prior approval procedures, and then by the failure of the vendor to submit a payment claim for the equipment after prior approval was granted.

■ As for proposed intervenor Marvin, his injury, a delayed determination of the necessity for special shoes, has been ad-

dressed by the defendants' agreement to send notice of the denial of prior approval requests. Accordingly, the motion for intervention is denied with respect to both Giordano and Marvin.

**Direct Requests by Patients and Notice of Filing**

■ Although the plaintiffs concede that if Medicaid recipients were themselves permitted to file requests for prior approval, the recipients would "in any case ... have the responsibility of providing evidence of medical necessity," they nonetheless seek the right for patients to make a direct request for prior approval. Plaintiffs rely upon the sections of the Social Security Act which require state Medicaid plans to employ such methods of administration as "necessary for the proper administration of the plan" and "consistent with simplicity of administration and the best interests of recipients," 42 U.S.C. §§ 1396a(a)(4) and (a)(19), as well as the implementing federal regulations, 42 C.F.R. § 435.902 *et seq.*, which contain general methods of administration. In particular, § 435.906 requires that an individual must be allowed "the opportunity to apply for Medicaid without delay." The appropriate standard for review of a state's Medicaid procedures under these provisions is whether those procedures are "irrational or arbitrary and counterproductive to the medical well-being of all Medicaid recipients" *Jennings v. Alexander,* 715 F.2d 1036, 1045 (6th Cir.1983); *Philadelphia Welfare Rights Organization v. O'Bannon,* 517 F.Supp. 501, 508 (E.D.Pa.1981); *Budnicki v. Beal,* 450 F.Supp. 546, 577 (E.D.Pa.1978).

■ Thomas Hartman, the Assistant Director for Health Care Standards and Analysis of the Office of Health Systems Management, DOH, has stated without contradiction that:

Recipients who would typically make a request on their own without having the provider make the request would be making that request because the provider refused to make the request to us, so we would have a lot of cases where requests

are made for items that someone else has already [decided] are not medically necessary.

In addition, in order to justify the request, the recipient would have to communicate with the provider, in any event ... in order to convince us that it should be provided.

That communication, in the best interests of the patient and the most efficient operation of the program, should occur prior to the filing of the request with us. Hartman Deposition, at 57–58.

In the first eight months of 1983, the DOH received 160,859 prior approval requests from providers who had already made a determination of medical necessity. To permit recipients unable to find a provider who agreed to the medical necessity of the desired item to file requests themselves in the face of a conceded necessity for such a provider evaluation would be to create an administrative chaos without any demonstrated or conceivable benefit to the patients. Moreover, no recipient would receive a decision on the prior approval request until medical justification was received.

Plaintiffs argue that the defendants' failure to permit direct requests by patients for prior approval violates 42 C.F.R. § 435.906, which provides "the agency must afford an individual wishing to do so the opportunity to apply for Medicaid without delay." This right was considered in *Perez v. Lavine,* 412 F.Supp. 1340 (S.D.N.Y.1976), but the court focused on 45 C.F.R. § 206.10(a)(1), which required that individuals be given the opportunity to apply for assistance without delay, and the court noted that that regulation applied only to new applicants and not to persons who were already in receipt of assistance and were seeking additional benefits.

The distinction between an initial application for a determination of Medicaid eligibility and an "application" by a Medicaid recipient (already determined to be Medicaid-eligible) for an additional medical service or supply is evidenced by 42 C.F.R. § 435.909. That section provides that a

separate application may not be required for persons who are automatically eligible for Medicaid due to their receipt of AFDC or SSI benefits, thus exempting those "categorically" eligible recipients from the only Medicaid "eligibility" determinations covered by 42 C.F.R. § 435.900 *et seq., i.e.,* the determination by the local Social Services District of whether an applicant is eligible to receive a Medicaid card. However, it does not exempt "categorically" eligible Medicaid recipients from the prior approval "application" requirements of New York's Medicaid program, as the prior approval process is not within the purview of 42 C.F.R. § 435.900 *et seq.*

Plaintiffs also claim that unless recipients are allowed to submit requests they have no way of knowing how long the agency is taking to make the determination, and are thus "effectively deprived of their right to a hearing to contest delays" under 42 C.F.R. § 431.241. This claim could be effectively resolved by imposition of an appropriate time limit on determinations of requests for prior approval. Consideration of this remedy is reserved for a later date, as discussed below.

Plaintiffs' final argument rests on 42 C.F.R. § 435.401(a), which prohibits the state Medicaid agency from imposing any eligibility requirement that is prohibited under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.,* on the grounds that an additional eligibility requirement is "effectively impose[d]" by the prohibition on direct application because recipients cannot obtain a reasonable opportunity to apply for needed medical assistance unless they have an effective provider. However, this position confuses eligibility with the procedure for the determination that the service or item is medically necessary. There is no issue of eligibility but rather one of reasonable qualification.

Assuming that it is appropriate to require a provider's certification of necessity, as is conceded by plaintiffs, no useful purpose will be served by requiring notice by the agency of the provider's filing at the patients' request, particularly in light of the following conclusions with respect to notice of action taken and procedures relating to the timeliness of appellate procedures.

## Notice of Decision

■ The defendants have agreed to give notice of the denial of any prior approval requests, both to the provider, as has been done in the past, and to the patient, in accordance with the stipulation reached between the parties after the initiation of this action. What remains then is whether the defendants must be required in addition to give notice of approval or modification.

Notice of approval is an extraneous and useless act, say the defendants, since the patient's request has been approved. Moreover, such notice is not required by either federal or state regulations, which speak only in terms of denial. Plaintiffs rely on *Budnicki v. Beal,* 450 F.Supp. 546 (E.D.Pa.1978), and *Yaretsky v. Blum,* 592 F.2d 65 (2d Cir.1979), in support of a right to notice of approval. However, both cases dealt with termination of benefits and relied on a specific regulation, 45 C.F.R. § 205.10(a)(4), which required timely notice prior to determination of benefits, and, in *Yaretsky,* 45 C.F.R. § 205.100(b)(1), which prohibited the state from delegating to private parties the responsibility of providing the notices required by § 205.10(a)(4). Neither 45 C.F.R. § 205.10(a)(4), nor its re-codification in the Medicaid regulations at 42 C.F.R. § 435.912, requires notices to be given upon approvals of prior approval requests. Moreover, the "plan ahead" rationale, referenced in *Budnicki,* has no relevance to approvals. When funding previously provided is to be terminated, a recipient may well have to make adjustments to accommodate the loss of a service or supply he/she previously received. Such is not the case when the recipient will be receiving an approved item he/she did not previously have.

Under some circumstances a modification could be considered a termination or a denial of benefits. The parties have, to all practical purposes, included such circum-

stances in the stipulation requiring notice, and that issue is out of the case.

As to notice of approval, there being no denial, due process is not impacted. There is no regulation requiring notice of approval, and given the timeliness consideration set forth below, any equitable considerations, if such were deemed appropriate, will reveal a balance favoring the defendants.

Given the expense involved in more than 100,000 notices and the interests of both provider and patient in obtaining the results of the approval already obtained, the utility of notice of approval to the patients is outweighed by far by the expense imposed upon the agencies. Even if *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), was applicable, the balancing test there described would favor the defendants.

**Notice of Conference, the right to consultative examination and the receipt of exhibits**

■ Plaintiffs' claimed right to an agency conference, consultative examinations and exhibits rests on state law and is thus not reviewable by this court. *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). To adopt the plaintiffs' view of this issue would be to circumvent the holding in *Pennhurst* contrary to our Circuit's direction in *Society for Good Will to Retarded Children, Inc. v. Cuomo,* 737 F.2d 1239, Nos. 83–7621, 83–7663 slip op. (2d Cir.1984).

**Time Limits**

■ Defendants have promulgated no time limits for initial determinations on requests for prior approval. Requests for prior approval are usually processed by professional reviewers in the Office of Health Systems Management ("OHSM") district offices, that is doctors, dentists, and other personnel with expertise in the medical area involved in the specific request. Where the professional reviewer feels that more information is needed, he can, in his discretion, either deny the request, return the request to the provider, or contact the provider by letter or telephone. Delays in determination without any regulatory limits existing were experienced by these plaintiffs. However, defendants have produced statistics about the time taken in processing prior approval requests during the months of January to August, 1983, revealing an average turnaround time varying from 5.2 days to 9.1 days, considering only working days. Delays resulting from requests for additional information were not reported.

Although there is arguably a factual issue as to the extent of delays that would remain as a result of the lack of time limits if the other challenged procedures are altered, in light of the disposition of these issues in this opinion, there is no real issue of material fact. Although defendants' statistics are impressive, they do not satisfy the need for appropriate limits.

Medicaid "shall be furnished with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8). The parallel regulation which requires the state defendants to furnish Medicaid promptly, without delays caused by the agency's administrative procedures is 42 C.F.R. § 435.930. The courts have frequently enforced this and other sections of the Social Security Act requiring prompt provisions of services, hearings, and decision. In *Smith v. Miller,* No. 76 Civ. 526 (N.D.Ill. Nov. 19, 1979), the court entered an order declaring that the state agency's failure to promulgate time limits for processing prior approval applications, and the related delays, violated 42 U.S.C. § 1396a(a)(8) and 42 C.F.R. § 435.-930, enjoining the Department to process such requests within 10–30 days, and ordering that all requests neither granted nor denied within those limits be automatically approved. In granting in part plaintiffs' motion for summary judgment, the court stated that:

> In comparable instances, courts have required that such limits be created and enforced. *See, e.g., Morgan v. Maher,* 449 F.Supp. 229 (D.Conn.1978) (delays of up to 60 days in replacement of lost or stolen AFDC checks violated "reasonable promptness" standard of Social Security

Act); *Cornelius v. Minter,* 395 F.Supp. 616 (D.Mass) (delays of two to six months in supplying emergency, financial and supportive services). *Randle v. Weaver,* No. 71 C 1359 (N.D.Ill., Jan. 30, 1974), *aff'd,* 419 U.S. 1028 [95 S.Ct. 509, 42 L.Ed.2d 304] (1974). *Cf. Jorden v. Weaver,* 472 F.2d 985 (7th Cir.1973) (enforcement of specific regulations for processing AFDC applications); *Like v. Carter,* 448 F.2d 798 (8th Cir.1971) (failure to process benefit applications where 30 day requirement); *Rodriguez v. Swank,* 318 F.Supp. 289 (N.D.Ill., 1970); *aff'd. mem.,* 403 U.S. 901 [91 S.Ct. 2202, 29 L.Ed.2d 677] (1971). In the absence of an express time for compliance, "courts are uniquely suited to determining what is reasonable." *Cornelius v. Minter,* 395 F.Supp. at 621.

The Seventh Circuit upheld the decision, finding that the court had the authority to order not only time limits but also automatic approval for their violation. Prompt action by the state is crucial in the medical assistance program, the court held, because even retroactive payment may not be fully remedial for the delays and "delay beyond the time limits may ... impose lingering, if not irreversible, hardships upon recipients." *Smith v. Miller,* 665 F.2d 172, 177 (7th Cir.1981).

Other courts presented with the issue of delay in the processing of prior approval requests have approved consent judgments setting time limits. In *McMahon v. Winter,* No. 3251 (Sup.Ct.Mass. Feb. 24, 1975) the decree requires action within fifteen days on requests for prior approval for durable medical supplies and equipment (except in emergencies). In *Turner v. Beal,* No. Civ. 74–1680 (E.D.Pa. May 24, 1975), the decree requires action within twenty-one days (except in emergencies).

In 1982 the average in-house turn-around offices outside New York City ranged from 1 day for pharmacy requests to 10.4 working days for dental requests. In 1982 the average in-house turn-around time for prior approval requests within the DOH New York City Area Office ranged from 1 day

for pharmacy requests to 15 calendar days for requests for physicians' services. In the first eight months of 1983, the average turn-around time for all six DOH area offices ranged from 1 day for pharmacy requests to 9.1 days for dental requests.

Given these authorities and this record, a time limit of 21 days for action by the agency is deemed reasonable and if no such action has been taken, both provider and patient must be notified of that fact and of the recipient's right to a fair hearing. However, should the parties conclude a further submission is required to fix an appropriate period to be covered by the regulations to be enacted, such submission will be entered within 21 days of the date hereof.

**Emergency Procedures**

■ New York does not require prior approval for any services provided in a situation which a recipient's provider considers to be an emergency. Plaintiffs contend that providers will refuse to supply a service in a situation that the provider considers to be an emergency because he/she will be afraid that DOH will not agree that an emergency was present.

There has been no showing of a failure to approve a prior approval form required by the Mc Auto billing computer submitted after emergency approval. There is no evidence here that the emergency certification by the provider, when approved, is not sufficient to provide the necessary services. Accordingly, plaintiff's motion for summary judgment is denied.

**Certification of the Class**

■ The class sought to be defined is: all current and future recipients of Medical Assistance in New York State who have required or will require supplies or services (not including transportation, personal care and services provided in institutionalized settings) provided by the State agency under prior approval procedures.

Given the facts as set forth above, the class is properly defined.

The defendants have also sought to limit any class to New York City. However, all

the procedures that are the subject of this action, including the lack of time limits which allows long delays before the recipients actually obtain the requested services, are in effect at all six area offices. Furthermore, the difference between the New York City DSS and others has not prevented district courts from certifying statewide classes in many Medicaid and other public assistance cases. *E.g., Morabito v. Blum,* 528 F.Supp. 252 (S.D.N.Y.1981), *Caldwell v. Blum,* No. 78 CV. 569 (N.D.N.Y. filed Dec. 3, 1979), *aff'd,* 621 F.2d 491 (2d Cir. 1980), stay denied, 446 U.S. 1311, 100 S.Ct. 1635, 64 L.Ed.2d 225 (1980); *Aitchison v. Berger,* 404 F.Supp. 1137 (S.D.N.Y.1975).

State defendants assert that there are no "questions of law or fact common to the class" and that plaintiffs do not meet the requirement of typicality imposed by Rule 23(a) of the Federal Rules of Civil Procedure. However, plaintiffs do represent Medicaid recipients injured by the lack of formal timeliness requirements.

With respect to the numerosity requirement of Rule 23a, 106,859 requests for prior approval were received in the first eight months of 1983. Therefore, the class is sufficiently numerous. Accordingly, plaintiff's motion for class certification is granted.

**Conclusion**

In sum, plaintiffs' motion for partial summary judgment is granted in part. The motions for joinder of certain defendants and for class certification are granted, the motion for intervention is denied.

IT IS SO ORDERED.